The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning, ladies and gentlemen, whoever you are. We're operating under unusual circumstances these days, but with the assistance of our excellent clerk's office, we're confident that we will have a worthwhile, useful argument. Our first case is 19-2263, Braemar Manufacturing, LLC v. Scottcare Corporation. And as I think everyone there knows, our second case is related. The patents are the same, but they come from different courts and have different counsel, and so we will treat them independently. So, Mr. Morris, please begin. Thank you, and may it please the Court. This Court recently held in CardioNet v. Infobionics that the claims of the 207 patent are directed to improvements in cardiac monitoring technology. The same is true of the 237 patent. The Court below addressed both patents in the same decision using very similar reasoning and ultimately committing the same mistake that the District Court in CardioNet did. It oversimplified the claims and failed to properly credit the intrinsic record. I'll briefly address the 207 patent in this case before turning to the 237 patent. For the 207 patent, this Court's recent decision in CardioNet is dispositive and warrants reversal. In CardioNet, the Court held that claims 1, 2, 10, and 22, among others, are patent eligible, reversing the very lower court decision that formed the basis for collateral estoppel in this case. Counsel, this is Judge Lorry. Even if you're right about the 207 patent, the 237 patent is quite different. 207, as you indicated, consists of several devices, whereas 237 describes operations comprising receiving a signal, classifying events, all passing information back and forth. That's quite different, isn't it? They go to different subjects. You're correct. But the reasoning of CardioNet is dispositive on the 237 patent. The main basis and reason for that is, as in the CardioNet case, the 237 isn't directed at a particular result, but to specific means that improve cardiac monitoring systems. The claims are not written in purely functional results-oriented terms. Rather, they specify a particular means for achieving the desired improvement. All the operative limitations relate to transferring information. Isn't that correct? They deal with the information coming from monitoring instruments. Correct. But they're dealing with exactly how to process that information and which information medical professionals will actually have within a larger monitoring system. This is Judge Chen. The challenge that you have, I understand you want to rely on this court's recent CardioNet opinion. But the challenge that you do have is that we have a lot of opinions from this court that talk about different forms of collecting data, comparing data to another threshold, and then transmitting data, storing data, discarding data. At least in certain ways, the claims here for the 237 are reminiscent of those cases. I think that's what you have to also deal with, rather than just saying, well, this is a CardioNet patent, and we've already ruled that a different CardioNet patent is patent eligible. Understood. And the fundamental difference between those cases that you referenced, like electric power and the rest, is they missed exactly what the patents here have, which is they had broad functional results-oriented language. Collect, analyze, and display. And the court said, for instance, in electric power, that the analyze left you the question of, well, how to analyze. But the 237 patent does exactly that. It spells out in the claims how to carry out the process. It starts by taking the information, categorizing it by event and by time, and then gives it a measure of merit, which is a unique invention by CardioNet. We have inventor testimony on exactly how that went down. But if then- But your problem with the line 44, this paragraph describes measure of merit in a way that it could mean almost anything. It just says a measure of merit of an event is evaluation of an event when applied to a particular purpose, and then it gives some examples. There's no real definition of what this is. It could be almost anything. Well, the claims say exactly where it is. For instance, in claim 25, where it says, determine the measure of merit, wherein the measure of merit embodies the severity of the event, so you're taking the severity and the amount of noise from the instrumentality. And in column 10 of the patent, it incorporates the 994 in terms of doing the noise. But it's- This is Judge Chen again. I was thinking about that trying to understand what does that mean that you determine a measure of merit based on severity of the event and the amount of noise in the information? Is that just trying to figure out what's the magnitude in the signal that is indicative of a cardiac event? So, depending on the event, the severity of the event is looking at, yes, the magnitude of the event for that particular event. Isn't that what technicians and doctors always did when they were looking at this electrocardiographic information? You would want to look at the degree of magnitude in a given moment of time, across a period of time. Is there something that I'm missing? I don't think so for that component. But again- You're saying doctors and technicians were never doing that? They were never looking at the magnitude of a given event during a certain time period? No. I think that encompasses, broadly speaking, part of what medical professionals are doing when they're looking at it. But we're talking about a process that is incorporating a variety of different pieces. Right. And it was already known that noise existed in these kinds of signals. And not only noise that's generated by the devices and transmissions themselves, but also physiological noise. Right. That's what your patent says at column 10. And it makes reference to the 944 patent. And it's quite clear that it was well understood that noise existed in these signals. And you had to take account for that kind of noise. And noise could be physiological or non-physiological noise. Am I missing something there? No, no. I think that's correct. Okay. So then, evaluating these electrocardiographic signals for both its magnitude or severity, if that's what you want to call it, and to take into account noise in the signal, those were already things that people had always been doing when they were making assessments as interpret the meaning of these collected electrocardiographic signals. There are aspects of things that occurred, but no one has put all these pieces together into the claims and what is here. So, what's your hook? What's distinctive that you can say, all right, here's our inventive contribution to society where we advance the well, putting it into categorizing by or putting a system together where you can set it up so that it has a system that goes by event, by time, puts those two together, and then transmits it to a remote location for the process. And so, it's all of those combined together in a claim that is the invention. And the only thing that the specification points to in column two that happened previously is either you had continuous review or you had batch handling. Those are the only two things that are happening. And so, what you have now with this system is one in which you're not straddled with either having someone continuously monitoring the data or you have someone who has batch handling where they put it all together and eventually you'll get it at some point. Let me give you a hypothetical. What if I'm a doctor and I'm a very busy person and I'm dealing with a lot of patients and it's really important that I have excellent monitoring of a certain patient who is having, you know, who's at risk of serious cardiac events, but I can't spend all my time constantly looking at the physiological information that's coming off of his monitoring system. So, I hire some student interns and I tell those student interns, you guys are going to be my first rough cut of all of this physiological information that this patient's monitoring system is spitting out. And here are a couple attributes I want you to look for when you're reading through all of the data. And if you find that combination of attributes, I want you to tell me. I want you to send that to me. But if you don't see it, then I don't want to see any reports on that. So, just send me the report on the information from the monitoring system that meets certain attributes. Do you think that would be an abstract idea or do you think that would be a patent-eligible invention? I'm not… This method, which is selectively transmitting information coming off of the monitoring system to me based on other people who have more time on their hands, who are combing through the constant data stream for data that has certain attributes attached to it. Is that a patent-eligible invention? And presenting to the doctor the sections of the… Just the good stuff. I don't want the irrelevant stuff. Just tell me when something important and relevant happens. And that's based on a few attributes that I tell my guys to look for in the data. Is that patent-eligible or is that an abstract idea? Well, if there's no evidence that doctors are doing it previously, it's not conventional, it's not known. Finish your answer, counsel. If it's not known previously, that is, there's nothing that shows that it's done before, I think it would be patent-eligible. The idea that you could come up with a process of doing it. But it sounds a lot like continuous or some form of continuous stuff. But doing all these pieces together in a claim is patent-eligible. And if not at step one, then definitely at step two, because it's putting them together in an inventive way. Mr. Morris, I assume you'd like to save some rebuttal time. I would. Thank you. Mr. Kent. Yes, Your Honor. May it please the court, I'm going to focus my argument on the 237 patent. And I'm going to start with reference to the electric power case. And in particular... Are you in effect conceding the point on 207? Practically speaking, Your Honor, probably. We disagree with the court's conclusion in that case, but we plan to preserve our arguments. We recognize that it's now controlling precedent, and I won't be arguing that there's a material difference between this case and that one for purposes of a motion for judgment on the pleadings on the 207 patent. And on 850 and 996, you're probably assuming that your fate depends on what happens in the next case to be argued. Well, Your Honor, in part, yes. And here's why. Obviously, if the court affirms in the next case to be argued, that would dictate an affirmance here because the underlying decision was based on collateral estoppel. If, however, the court comes to a different conclusion in that other case, it may be important and may be instructive. I'm sorry, Your Honor, were you asking a question? No, I was clearing my throat. I apologize. That decision may be instructive if the court comes to a different conclusion, but it is not necessarily dispositive because the only thing that the district court addressed in the case that we are talking about now from the Eastern District of Pennsylvania was the application of collateral estoppel, and I think this court's precedent, like the Varden-Goff case, makes clear that that's the only thing that this court should address in terms of the propriety on appeal. So, in short, a decision other than an affirmance on the 850 and the 996 will be very important, but its application, I think, would have to be left to the district court taking this court's opinion as guidance. All right. On to 237. Yes. Back to the 237. To address a few questions that were asked of opposing counsel, there was a question about measure of merit and what it is. We do have a Markman decision in the case, and it is very broadly defined, and you can find this at Appendix 1800 and 1801. Measure of merit is simply a valuation applied to a particular purpose, so I don't think it teaches anything particular at all. If you take a look at the measure of merit calculation in this case, what the claims describe are basically using two basic inputs, noise and severity, then combining them into a single score in order to classify and transmit already-detected cardiac events, and I would direct the court's attention in particular to Figure 10. That's in Appendix 127. Figure 10 is supposed to show the purportedly inventive concept of measure of merit, and it's just three simple boxes. That's it. That is an abstract idea, to Judge Chen's point, that is capable of being performed by humans, regardless of whether it actually has been. And the claims calling for that calculation, that very simple algorithm to be performed with computer components, even accounting for the ordered combination of the claims, at best only adds speed to that process. And that's why I come back to electric power, which directs that manipulation of information to provide a humanly comprehensible amount of information useful to users does not by itself transform the otherwise abstract processes of action. Mr. Kent? So, yes. Mr. Kent, this is Judge Chen. I'd like you to really focus on what we said in the CardioNet opinion as to the 207 patent. I mean, in that case, as I understand it, we found that was an improvement to monitoring technology for atrial fibrillation events, and we said that was what was claimed there was an improved device that more accurately detected such events by detecting the variance in beat-to-beat timing caused by premature ventricular beats. So, in that sense, one could look at that invention as being a filtering process, a data processing filtering process where you recognize there's certain things that aren't actually atrial fibrillation events, and so you want to discard that. And so, on a certain level, that's starting to sound a little bit like what's going on here. You're trying to detect some characteristics about these signals that help you separate the wheat from the chaff, which in a way is what the 207 patent looks like it also is doing. So, could you speak to that? I can, Your Honor. The 207 patent at issue in that 1911-49 decision is the only patent involved in this case that is actually aimed at improving the automated detection of an arrhythmia event itself. As I read this court's opinion, it saw the 207 claims in that case as trying to solve a problem, recognizing a pattern demonstrating atrial fibrillation in the presence of ventricular beats. Those ventricular beats could create inaccuracies in previous detection schemes. So, basically, those ventricular beats, in the court's opinion, threw off the detection of the event itself, and the claims were directed to the use of computers to account for those ventricular beats in the process to cure that problem. So, the court described those claims as within the class of claims that focus on an improvement in computers as tools rather than those that merely collect electronic information, display it, or embody mental processes. The 237 claims are very different, and here's why. They deal only with data comprised of already detected events and simply select which of those events to send for review. In other words, the 237 claims in this case can be inserted into a system with conventional computer components that can detect and transmit a cardiac signal, and it would simply filter and characterize those events for review, whereas in this court's decision with the 207 patent, 1911-49, that was an improvement to detecting events itself. It made the technology more accurate. We don't have that here with the 237 claims. Noise and severity are just assigned values combined into a single score and then classified on that score. That's not a technical solution. It's computerizing what amounts to a fairly simple algorithm, and I would direct the court's attention in terms of analyzing this, Judge Chen, to Tables 3 and 4 of the patent. They confirm that. That's at Appendix 134 in Columns 9 and 10, and also the discussion around it. They're just taking the biological signal. The claims are just taking the biological signal and scoring it and organizing it based on that score. Just to take that point a little bit further, the 237 patent claims on their face describe themselves as organizing and presenting information contained in the biological signals, so they confirm that this falls into the latter category of filtering and organizing data. Hopefully, I answered Your Honor's question on that point. Basically, this is using conventional computer components to perform conventional activities, just using the ECG signal as an input. Affirming that the asserted claims of the 237 patent here are abstract at Alice Step 1 and, frankly, at Alice Step 2 is entirely consistent with this court's rationale in 1911-49. There's no inconsistency between them. Just moving on, I think it was Judge Chen that asked a question about the categories of cases and the spectrum of case law that this court has on collecting information. On the one hand, we have, in this case, CardioNet citing cases like KPN, MCRO, FinGen, and MFISH. Then you have SCOTCARE and they talking about citing the cases like electric power, cyber phone, intellectual ventures versus Erie and Erickson. I would submit that the second category, the ones that SCOTCARE is citing are, in Judge Chen's words, I think you used the term reminiscent. This case is reminiscent of those cases like electric power and cyber phone. The other cases that CardioNet, excuse me, cites to are very different in that they tell how to implement the invention in a very specific way to improve specific technology in a very tangible way. When you look at the claims in those cases, they are qualitatively from the 237 patent and the patents that issue in electric power. In terms of parallels, electric power is particularly on point. That involved a composite indicator of reliability drawing on several data streams to provide an indicator of grid vulnerability. That's much like the 237 measure of merit here, which is at best a composite of two data points designed to rank cardiac event. In both cases, there's just a system running math equations on two data streams. I think intellectual ventures versus Erie is also very instructive here. If you look at the claim language recited on page 1327 of that case, that's 850F3, 1315, it's remarkably similar to the claim language of the asserted 237 claims here. You can look at them side by side and they basically mirror each other. I think this court's recent decision in Erickson versus TCL is also instructive. It relied on the claim language to conclude that automating a process involving controlling access to resources is an abstract idea because it can be done by the human mind. I think what you have with the 237 claims here is very similar. It's categorizing and sorting arrhythmia events based on relevance. That's exactly the sort of process that can be performed by the human mind. That's a decision this court can make on the intrinsic evidence just looking at the pattern. I'll take a few minutes and talk a little bit about Alice step two. In its brief, CardioNet suggests that the district court skipped over that process and didn't give any credit to the measure of merit. That's simply not correct. The district court specifically pointed out CardioNet's argument that the claims show inventive concept by creating a combined measurement of severity of adverse cardiac events together with the signal noise level to automatically identify less clinically significant events. That's an appendix 16 and 17, by the way. This is CardioNet's claim measure of merit. The district court went on and analyzed the 237 claims against the analysis from BASCOM and pointed out in some detail the differences, noting that in BASCOM, the inventive concept set out by the combination of claims was not just a filtering system. It was a system that adjusted from a one-size-fits-all filter at the ISP server to providing individualized filtering at a remote ISP server. It basically set up a system where the ISP server tied back to the individual users at specific machines so that the filtering couldn't be hijacked locally. That involved an inventive concept in the interplay of processes between the remote server's filtering system and the identification of the specific user at a local machine. This court also noted that BASCOM was a close call. The district court in its analysis distinguished BASCOM because here the 237 claims do not provide a specific inventive technological improvement for many of the reasons I just mentioned earlier. It just caused the abstract idea of collecting, classifying, and transmitting data to be performed using conventional technology. So the district court was certainly correct in determining that the measure of merit did not express an inventive concept. I would point again to this court's decision in Erikson versus TCL because I think the district court's decision here is very much in line with it. The district court in Erikson, I'm sorry, this court in Erikson said that even assuming that collection of elements led to a more efficient way of controlling access. Our precedent is very clear that merely adding computer functionality to increase the speed or efficiency of the process does not confer patent eligibility on an otherwise abstract concept. Here, the 237 claims simply focus on a way of more efficiently sorting data. They require a generic computer. Finish your thought, please. They require a generic computer to perform generic computer functions. So I don't want to take much more of the court's time. Just coming back to the spectrum of cases, this court should affirm on the 237 patent. It's far more similar to electric power, cyber phone, etc., and that side of the spectrum than it is to anything that's been cited by CardioNet and its briefs, and it's a simple algorithm that can be performed by a human when you actually dig down into the patent and look at the intrinsic evidence. Thank you. Thank you, counsel. Mr. Morris has three minutes for rebuttal. Thank you, Your Honor. Just to touch on a few points raised by my colleague. The Markman decision merely touched on the term measure of merit. It didn't purport to address the rest of the claim language that says wherein it is a combination of the severity of the event and the noise. With respect to the noise aspect, returning once again to Judge Chen's question about the 994 patent, at Appendix 5750, the 994 says that there is really no suitable way for non-physiological noise to be detected and no known technique for detecting physiological noise, and therefore there was a need to do it. The 994 patent did provide that way, but as the court said in Berkheimer, merely because it's in a prior art reference doesn't make it conventional within the court's meaning of that term in the 101 area. So there's no sense in which and the noise within the processes laid out in the claims themselves. The 207 and 237, as I said before, the district court did precisely the problem that the district court did with the 207, which is it looked at it at too high a level of generality. And that's the only way in which you get to broadly categorizing is collecting, analyzing data. There are particular steps laid out, a particular means, as the court put it in McRow, and there's a particular configuration. So whether you do it at step one or step two, what you have is a very particular process laid out before the court in the claims themselves. With respect to the 850 and 996 patents, just coming back, it's a bedrock principle of preclusion law that a reverse judgment cannot support preclusion. This court said that in the second judgment based upon the preclusive effects of the first judgment should not stand if the first judgment is reversed. So reversal in that case requires reversal here on the 850 and 996, as well as the 207. Thank you. Thank you, counsel. We have your arguments and the cases submitted.